IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:25CR103 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT L. SCARVELLI, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, David M. Toepfer, United States Attorney, and Jennifer J. King, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant, Robert L. Scarvelli ("Scarvelli").  For the reasons set forth below and those to be articulated at the sentencing hearing, the United States submits that a sentence within the applicable Guidelines range is appropriate in this case.

On March 18, 2025, Scarvelli was indicted on one count of Receipt of Visual Depictions of Real Minors Engaged in Sexually Explicit Conduct in violation of 18 U.S.C. § 2252(a)(2) and one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). (Indictment).  Scarvelli plead with a plea agreement on September 9, 2025 to Count One. (Presentence Report Investigation ("PSR"), Page 3). On Count One, Scarvelli faces a statutory mandatory minimum term of imprisonment of five years up to 20 years; a fine of $250,000; supervised release for a minimum of five years up to life; and a special assessment of $100. According to the Presentence Investigation Report ("PSR"), Scarvelli's offense level is 34 and he

1

is a criminal history category I.  Based on these calculations, Scarvelli's guideline imprisonment range is 151 to 188 months.  (PSR, Page 12).

## I.      APPLICABLE LEGAL STANDARDS

### A.      LEGAL PRECEDENT FOR GUIDELINE SENTENCE

The United States requests a Guideline sentence for Scarvelli, consistent with the law and research highlighting the danger posed by child pornography offenders.  Numerous courts have emphatically expressed the wretched consequences of child pornography.  For example, the court in *United States v. Cunningham*, 680 F.Supp.2d 844 (N.D. Ohio 2010), noted:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions.
>
> Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.[1]

In *United States v. Goff*, the Third Circuit made note of the traumatic impact child pornography offenses have on the victims, contrary to the sentiment of some courts that believe the offense is "just pictures." [2] The court stated:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography. These small victims may rank as anyone else in [defendant]'s mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are far too real. There is

---

[1] *Id.*
[2] 501 F.3d 250, 258-59 (3rd Cir. 2007).

nothing casual or theoretical about the scars they will bear from being abused for [defendant]'s advantage.

The defendant in another case, *United States v. MacEwan*, tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs.[3] The Third Circuit was not persuaded, reasoning as follows:

> Congress found that where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.
> Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.
> Furthermore, it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.[4]

In *United States v. Norris,* the defendant claimed that children depicted in child pornography are not victimized by receipt.[5] Rather, the defendant claimed that the victimization occurred solely when the child pornography was produced.[6] The Fifth Circuit thoroughly repudiated that argument as follows:

> Norris takes an unrealistically narrow view of the scope of harms experienced by the child victims of the child pornography industry. Unfortunately, the victimization of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be

---

[3] 445 F.3d 237, 249-50 (3rd Cir.2006).

[4] *Id.* (citations omitted); see also *United States v. Duhon*, 440 F.3d 711, 718-20 (5th Cir. 2006); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

[5] *United States v. Norris*, 159 F.3d 926, 929-30 (5th Cir. 1998), *cert. denied*, 526 U.S. 1010 (1999).

[6] *Id.*

causing the children depicted in these materials to suffer as a result of his actions in at least three ways.

*First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. [T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation*. . . .  The consumer who merely or passively receives or possesses child pornography directly contributes to this continuing victimization.

*Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted.  Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

*Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials.  As Congress put it in explicit factual findings:

[T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry.  The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography.  Neither could exist without the other.  The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued

4

production of child pornography, which entails continuous direct
abuse and victimization of child subjects.[7]

These children often live with the knowledge that there are numerous, unknown individuals

in the world who are sexually gratifying themselves with pictures of the worst moments of the

children's lives, and that such exploitation will continue indefinitely.[8]  In *New York v. Ferber*, the

U.S. Supreme Court noted: [P]ornography poses an even greater threat to the child victim than

does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the

pornography may haunt him in future years, long after the original misdeed took place. A child

who has posed for a camera must go through life knowing that the recording is circulating within

the mass distribution system for child pornography.[9]

Consumers of child pornography such as Scarvelli also create a market and demand for

the production of these images and videos, which depict the sexual abuse and exploitation of real

children. These consumers therefore contribute to the cycle of abuse and are in part responsible

for the harm suffered by children used to produce the images and videos in their collections.[10]

In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a
> sentence affects only the life of the criminal and not the lives of his
> victims. Young children were raped in order to enable the
> production of the pornography that the defendant both downloaded
> and uploaded-both consumed himself and disseminated to others.
> The greater the customer demand for child pornography, the more
> that will be produced. [Citations omitted].[11]

---

[7] *Norris*, 159 F.3d at 929-31 (emphasis in original) (citations omitted).
[8] *See United States v. Blinkinsop,* 606 F.3d 1110, 1118 (9th Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium").
[9] 458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).
[10] *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography").
[11] 491 F.3d 668, 672 (7th Cir. 2007).

Thus, even if consumers of child pornography do not themselves molest children, their actions contribute to the abuse of children.

## II.     SENTENCING GUIDELINES COMPUTATION

Scarvelli makes no objections to the enhancements listed in the presentence report.  (PSR, Page 20).  However, Scarvelli's sentencing memorandum argues for a downward variance since he believes "many of the U.S.S.G. § 2G2.2 sentencing enhancements are imposed in every case". (R. 18: Def. Sentencing Memorandum, PageID 138-41). The sentencing enhancements common application in trafficking of child pornography cases was considered when setting the base level offense and the mandatory minimum of 60 months. There is a historical record of application of the enhancements, and Scarvelli's case presents no factual basis for a variance.

The two-level enhancements under § 2G2.2(b)(2) for material involving prepubescent minors, use of a computer under § 2G2.2(b)(6), and the five-level enhancement for the number of images under § 2G2.2(b)(7) are appropriate in this case. Scarvelli possessed CSAM on multiple platforms to include a desktop computer, storage devices (digital hard drives), and a cell phone where he saved collections of CSAM. Although most CSAM cases involve a computer, that does not make the enhancement meaningless because Congress intended to prevent child pornography from reaching a limitless audience through internet capable devices and enhancing offender's guidelines when they misused computers.

Scarvelli ignores the fact that Congress established a five-year mandatory minimum for certain child pornography trafficking offenses under the PROTECT Act.  The Sentencing Commission amended § 2G2.2 in 2004 and noted, "[w]hen Congress establishes a mandatory

minimum penalty, the Commission generally has four approaches available for selecting the appropriate base offense level." *The History of the Child Pornography Guidelines, United States Sentencing Commission, October 2019,* p.44. "First, the Commission may set the base offense level for the offense so that the base offense level for a Criminal History Category I offender corresponds to the first guideline range on the sentencing table with a minimum guideline range in excess of the mandatory minimum." *Id.* "Second, the Commission may set the base offense level to the guideline range that is the first one on the table to include the mandatory minimum at any point within the range." *Id.*, at 45. "Third, the Commission may set the base offense level below the mandatory minimum and rely on specific offense characteristics and Chapter Three adjustments to reach the statutory mandatory minimum." *Id.*

The Commission chose the third option. "The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, and number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations." *U.S.S.G. App. C, Amendment 664*, pp. 58-59. Citing statistics that show how often these enhancements are applied simply proves the point. Each of these enhancements are baked into the Commissions calculus in setting the base offense level at 22. To fail to apply any of these enhancements would be to give the Defendant an unwarranted reduction in his offense level. The 6th Circuit agrees:

> In drafting § 2G2.2, the Sentencing Commission explicitly considered whether the computer enhancement would be frivolous. See *U.S.S.G.App. C, Amend. 664*, pp. 58–59. The Commission purposefully set both the base offense level and the degree of enhancement with the frequency of computer use in mind. *Id*. We have adopted that rationale and rejected arguments that the

> computer enhancement should not be used simply because it is
> applied frequently. See, e.g., *United States v. Cunningham*, 669 F.3d
> 723, 732–33 (6th Cir. 2012) (affirming the district court's rejection
> of defendant's argument ''that the frequency with which the
> enhancements applied in other cases rendered them invalid'')."

*United States v. Walters*, 775 F.3d 778 (6th Cir. 2014), 786-87.  See also, *United States v.*

*Bistline*, 665 F.3d 758 (6th Cir. 2012).

The use of the computer enhancement punishes defendants "for using a particularly

insidious method of acquiring child pornography," and, as the Sentencing Commission itself has

recognized, the perpetual nature of distribution on the internet causes a "continuing harm to

victims" that is "lifelong."  2012 Commission Report at 311.  The computer-use enhancement is

"rationally related to the legitimate interest in punishing offenders for perpetrating these

harms."  *Id.*

Hundreds of the images on Scarvelli's devices were of minors who were prepubescent or

a minor who had not obtained the age of 12 years.  In *United States v. Lynde*, 926 F. 3d 275 (6th

Cir. 2019), the defendant made a similar argument about enhancement for prepubescent minors.

The Sixth Circuit Court of Appeals ruled that:

> We have also rejected Lynde's claim that § 2G2.2's enhancements
> must be disregarded because they apply in most cases and do not
> adequately distinguish among offenders. See *United States v.*
> *Walters*, 775 F. 3d 778 (6th Cir. 2015).  If the "harm is real, we have
> reasoned the enhancement is valid, no matter how often it applies.

Similarly, Scarvelli's disagreement with the "number of images" enhancement under

2G2.2(b)(7)(D) also relies on the *Hennessey* opinion that it cannot be an "aggravating factor" if it

is present in almost any child pornography case. *United States v. Hennessey*, No. 3:15-CR-131,

ECF. 25 (N.D. Ohio Nov. 24, 2015). Again, the almost every case scenario is something that

8

Congress considered when it tiered the enhancements for the number of images possessed or trafficked by a defendant.

The number of images involved in this case was determined to be 78,425 images based on 980 videos and the 4,925 images (per the 75 images per video calculation outlined in the Commentary Note to United States Sentencing Guideline 2G2.2).  See 2G2.2 *Commentary Note 6(B)(ii)*.  This is not a typical child pornography case.  The Scarvelli possessed 77,825 images *over* the 600-image maximum contemplated by Congress.

As such, the enhancements in the PSR are properly applied and Scarvelli should be sentenced in accordance.

## III.   APPLICATION OF § 3553(A) FACTORS

### A.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.  Scarvelli actively sought CSAM on the internet, downloaded it to his computer, saved it to his devices, and distributed it to law enforcement. Scarvelli is more than just a casual observer who happened to download child pornography while seeking legal pornography.  For nearly six months law enforcement observed Scarvelli traffic images of children being sexually abused. Despite his extremely large collection of child pornography, Scarvelli admitted to using CCleaner on his desktop to remove files and search histories. As such, it is reasonable to conclude the thousands of images and videos of CSAM Scarvelli possessed were only a fraction of the files he consumed.

The videos Scarvelli collected depict the sexual abuse of children varying ages and in a wide range of sex acts. The videos described in the PSR are just a small sampling of the truly horrific content Scarvelli preferred for his sexual gratification.

B.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Scarvelli grew up in Northeast Ohio and reports good relationships with his family.

Scarvelli is a high school graduate and has held consistent employment most of his adult life.

Outside work as a tow motor operator, he states he uses BitTorrent, the program he used to

traffic child pornography, to produce music.  Although he suffers from seizures, he states they

are managed well with medication. Scarvelli has a history of substance abuse, but neither this

physical, mental or substance abuse conditions offer an explanation for his distribution and

possession of child pornography.

C.    NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF
       OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST
       PUNISHMENT

In *Bistline*, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the

offense or provide for any general or specific deterrence.[12] Congress has plainly indicated "[e]very

instance of viewing images of child pornography represents a . . . repetition of their abuse." [13] The

words of Congress and many courts echo the victims themselves.  For many victims, the

downloading of images is just as traumatic as the initial act of abuse.  These victims express

embarrassment of being depicted in these extremely vulnerable situations.  They also express fear

of being watched and subsequently recognized by people like Scarvelli who fixate on videos and

images of them.

Scarvelli committed child exploitation offenses in the comfort and privacy of his own

home, and he alone is responsible for his actions and the impact they have had on the children

---

[12] *See United States v. Bistline*, 665 F.3d 767-68 (6th Cir. 2012).
[13] 18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)).

depicted in those images.  He alone obtained child pornography, shared child pornography, and then saved the perverse material to his devices.

Scarvelli trafficked and possessed a large number of images that should place him with the most prolific offenders receiving and distributing child pornography. He received the highest guideline enhancement for having over 600 images.

D.    NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.[14]  In *United States v. Goldberg,*[15] the court opined:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the *Bistline* Court reversed a district court that failed to see any importance in general deterrence.[16]  The district court stated, "general deterrence . . . will have little [if] anything

---

[14] *United States v. Irey*, 612 F.3d 1160, 1206 (*citing New York v. Ferber*, 458 U.S. 747, 760 (1982)) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); *Osbourne v. Ohio*, 495 U.S. 103, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); *United States v. Goff,* 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.  Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.).
[15] 491 F.3d 668, 672 (7th Cir. 2007).
[16] *See Bistline*, at 767.

to do with this particular case."[17]  The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'"[18]

Even though Scarvelli and others who have an overwhelming interest in the sexual assault of young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Scarvelli received a below guideline sentence.  These offenders do talk to each other via the Internet, and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, and use anonymous phone apps in an effort to prevent detection.  There is much to be gained by a significant sentence—increased safety for our children.

## IV.     MONETARY PENALTIES

### A.     FINE

The PSR report finds that Scarvelli does not have the ability to pay a fine in this case.  The government defers to the Court and first seeks restitution in the amount requested by the victims and any special assessment be ordered before a fine.

### B.     18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Due to the lapse in appropriations, Scarvelli is not subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014.

---

[17] *Id.*

[18] *Id.* (citing *United States v. Camiscione,* 591 F.3d 823, 834 (6th Cir. 2010)).

C.      THE AMY, VICKY, AND ANDY CHILD PORNOGRAPHY VICTIM
        ASSISTANCE ACT OF 2018 (AVAA) GENERALLY

The *Amy, Vicky, and Andy Child Pornography Victim Assistance Act* of 2018 (AVAA),
enacted on December 7, 2018, made a number of changes to existing child pornography laws,
specifically with regard to restitution. Specifically, the law: (1) provides that restitution must be
ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim; (2)
imposes a new special assessment for those defendants who are convicted of certain child
pornography related offenses; (3) permits victims of child pornography trafficking offenses to
seek a one-time payment of $35,000 from a reserve fund; (4) amends the definition of "sexually
explicit conduct" under 18 U.S.C. § 2256(2); and (5) adds 18 U.S.C. § 3509(m)(3), which allows
victims, their attorneys, and any purported expert to access a victim's own sexually explicit
images during any criminal proceeding.  Of particular importance in this case is the provision that
sets a <u>floor</u> of $3,000 in restitution to the victims depicted in the Defendant's images that have
submitted a claim for a monetary loss.

D.      PAROLINE V. UNITED STATES, THE 2014 U.S. SUPREME COURT CASE
        ON RESTITUTION IN CHILD EXPLOITATION CASES

In *Paroline v. United States*, 134 S. Ct. 1710 (2014), the Supreme Court held that a child-
pornography victim was entitled to restitution from a possessor of her images, even though "the
victim did not know who [the defendant] was and . . . none of her claimed losses flowed from any
specific knowledge about him or his offense conduct." *Id*. at 1718, 1722.  Employing a proximate-
cause standard, it explained that "a court applying § 2259 should order restitution in an amount
that comports with the defendant's relative role in the causal process that underlies the victim's
general losses." *Id*. at 1727.  The amount must not be "a token or nominal amount," even in a
case involving possession (as *Paroline* was) or receipt (as here), as opposed to production.  *Id*.

13

Rather, a "reasonable and circumscribed award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role" is necessary.  *Id*.; (noting that such an award "serve[s] the twin goals of helping the victim achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims").

In deciding the appropriate amount of restitution, "a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses."  *Id*.  Importantly, "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment."  *Id*.; *accord Id*. (reaffirming that it is "neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount").  Factors that may be relevant, if known, include the total "amount of the victim's losses caused by the continuing traffic in the victim's images," "the number of past criminal defendants found to have contributed to the victim's general losses," "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses," "whether the defendant reproduced or distributed images of the victim," and "how many images of the victim the defendant possessed." *Id*.  As the Supreme Court warned, however, "[t]hese factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders." *Id*.

E.     RESTITUTION REQUESTS IN THIS CASE

The National Center for Missing and Exploited Children (NCMEC) identified two series of CSAM from Scarvelli's collection that depicted a victims previously identified by law enforcement. Only one series made a restitution request with a victim impact statement.

| | Series Name | File Count per NCMEC | Restitution Request | Payable to: |
|---|---|---|---|---|
| | "Nicoletta" of "MarshaRiver" Series | 6 Videos | **$5,000** | Deborah A. Bianco in Trust for Nicoletta PO Box 6503 Bellevue, Washington 98008 |
| | | **TOTAL** | **$5,000** | |

Factors relevant to restitution in the MarshaRiver series support a restitution order of $5,000. Scarvelli possessed six videos (or in calculated terms 450 images) of the sexual abuse of "Nicoletta".  See 2G2.2 Commentary Note 6(B)(ii).  Scarvelli had no connection to the production of this CSAM, but did distribute at least one of the videos. Currently, there is no total amount for "Nicoletta's" losses, but her attorneys estimate the cost for records and the psychological evaluation will be approximately $25,000 and the average cost of therapy is "almost never less than $100,000." Under *Paroline*, the possession of just one image would require $3,000 in restitution. Scarvelli possessed 450 images of "Nicoletta" and is reasonably requesting $5,000 in restitution.

15

## V.     CONCLUSION

For these reasons and those to be articulated at the sentencing hearing, the United States

respectfully requests that this Court impose a sentence within the sentencing guideline range.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:     /s/ Jennifer J. King
        Jennifer J. King (OH: 0089375)
        Assistant U.S. Attorney
        801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113
        Tel. No. (216) 622-3759
        E-mail: Jennifer.King@usdoj.gov
